UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 20-CR-214-JED |
| | ) |
| SERGIO LOPEZ-RAMIREZ, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

The defendant, Sergio Lopez-Ramirez, moves to suppress evidence found by a sheriff's deputy during a roadside search of his vehicle. (Doc. 24). The Court heard evidence on the matter during a hearing held March 18, 2021. (Doc. 33). For the reasons explained below, the Court holds that the search of the vehicle was unconstitutional and that the evidence should be suppressed.

**I.   Background**

On the evening of September 6, 2020, Mr. Lopez-Ramirez had just dropped some friends off at the Cherokee Nation's Hard Rock Hotel & Casino in the Tulsa suburb of Catoosa when Rogers County Sheriff's Office Deputy Trenton Morris noticed that Lopez-Ramirez had failed to turn his headlights on. As Lopez-Ramirez headed south on 193rd East Avenue, Morris signaled for him to pull over. Although that stretch of road is flanked by two parking lots—one owned by the casino, the other by a McDonald's—Lopez-Ramirez pulled over to the curb, leaving the vehicle in the right-most lane of traffic.

Morris said he initially approached the vehicle from the passenger's side in order to avoid having to stand in the roadway, which was thick with traffic. As he did so, he saw Mr. Lopez-Ramirez "nervously making movements within the driver's area of the vehicle." After Deputy Morris realized that Mr. Lopez-Ramirez did not speak English, he decided to move to the driver's

side. As he moved around the rear of the vehicle, Mr. Lopez-Ramirez's shoulders slumped, suggesting that he was "still messing with something" in the floorboard area.

After Deputy Morris reached the driver's side, he used Google Translate to tell Lopez-Ramirez why he was pulled over and to ask for his license and insurance. Lopez-Ramirez said that he had neither, having borrowed the vehicle from a friend. At this, Deputy Morris asked Mr. Lopez-Ramirez to join him in Morris's patrol cruiser, so they could speak more easily, and Mr. Lopez-Ramirez complied. While holding the door open for him, Deputy Morris testified, he saw Mr. Lopez-Ramirez use his foot to push a blue bag under the seat. Then, while performing a pat-down, Morris observed a round of ammunition in the driver's side floorboard.

Once in the patrol cruiser, Deputy Morris repeated his questions and, after confirming that Mr. Lopez-Ramirez did not have a valid driver's license or proof of insurance, told him that he was under arrest for driving without a license. Morris then removed Mr. Lopez-Ramirez from the vehicle, searched him, cuffed his hands behind his back, and placed him in the front seat of the patrol car.

After completing the arrest, Deputy Morris called a tow truck to remove and impound the vehicle. Morris testified that his decision to have the car towed, as opposed to moving it into a lot and leaving it at the scene, was entirely based on Sheriff's Office policy and public safety concerns.

The Sheriff's Office's policy provides that towing is a permissible—but disfavored—means of securing a vehicle following an arrest:

> Whenever the owner or operator of a vehicle is arrested, the arresting deputy should provide reasonable safekeeping by leaving the vehicle secured and lawfully parked at the scene or, when appropriate, by having the vehicle towed, such as when the vehicle presents a traffic hazard, [sic] the vehicle would be in jeopardy of theft or damage if left at the scene.
> Deputies are not required to investigate whether alternatives to towing a vehicle exist after an arrest. However, a vehicle should not be towed if reasonable alternatives exist. When considering whether to leave a vehicle at the scene,

2

> deputies should take into consideration public safety as well as the reasonable safety of the vehicle and its contents.

(Doc. 27-1, Ex. D). The policy never requires an officer to tow the vehicle, but it authorizes deputy-ordered towing in certain scenarios, including when:

> (c) The person driving or in control of the vehicle is arrested for an alleged offense for which the deputy is required by law to take the person arrested or summoned before a proper magistrate without unnecessary delay.
> . . . .
> (e) The deputy has probable cause that the person operating the vehicle has not been granted driving privileges . . . .
> . . . .
> (g) The deputy has probable cause that the vehicle is not insured as required by the Compulsory Insurance Law of Oklahoma.

(*Id.*).

Even when towing is authorized, the policy provides examples of situations when the vehicle should nevertheless not be towed, such as when the vehicle "can be legally parked, left in a reasonably secure and safe location and is not needed as evidence." (*Id.*). When a vehicle should be towed because it is a hazard, the policy provides that the deputy should allow the owner or operator to arrange for towing unless that person is unable to do so. (*Id.*). The policy also permits deputies to move a vehicle a short distance if necessary. (*Id.*).

Deputy Morris testified that the vehicle had to be towed because it was a traffic hazard and there was no good place to park it in the immediate vicinity. While the parking lots for the McDonald's and the casino were close at hand, both businesses had previously told him that they "do not want vehicles parked on their property." In fact, McDonald's had a sign limiting parking duration to no more than an hour. Moreover, that part of Catoosa, Morris claimed, is "a high crime and vandalism area," so it would have been unsafe to leave the vehicle unattended in those lots.

Morris testified that he did not move the vehicle himself because he feared Lopez-Ramirez would run:

3

> Leaving a handcuffed individual in the front seat of my car while moving a vehicle to a place of business, not being able to have constant eyes on an arrested subject that I'm liable for if they get out of my car, any injuries sustained from running, it's just not a plausible safety -- it's not safe to do so.

When asked why he did not simply secure Lopez-Ramirez in the cruiser, Deputy Morris seemed to equivocate:

> Q.   And with -- would you have been able to lock him inside your vehicle?
> A.   Yes, but due to the manufacturing of that particular vehicle, the front two locks are overridden, so even if it's locked, the front two doors can come open while it's locked, and the window can be rolled down even though . . . the window lock is off. So, he could easily roll down the window, open the car door, unbuckle the seat belt, and flee the scene.

Because vehicles towed at the order of the Sheriff's Office are left in the custody of the towing company, the policy requires deputies to inventory a vehicle before it is towed. Deputy Morris testified that he began his inventory by searching the area around the driver's seat: "Through my training and experience, I believed that's going to be where I was going to locate a firearm or something of illegal nature due to his furtive movement throughout the traffic stop."

His suspicions were borne out. While searching under the seat, he found a loaded pistol in a blue bag. Morris testified that a further search turned up a baggy of methamphetamine in the console, some cash in Mr. Lopez-Ramirez's wallet (Morris did not say how much), and a cellphone.

Although the inventory policy requires deputies to inventory "[t]he contents of all vehicles towed at the request of office members" and to provide the towing company and the arrestee with a copy of the ensuing report, Morris did not complete his report until several hours after the vehicle was towed, and he never provided copies to the company or to Mr. Lopez-Ramirez. Morris testified that he was unable to complete the report on site or provide the requisite copies because the Sheriff's Office was out of the carbon-copy forms normally used for the reports. Consequently, he had to fill out a report on his computer later that evening.

Exactly what was in the car at the time remains in dispute. Although the report said the vehicle contained "nothing of value," only miscellaneous "trash" and "clothing," (Doc. 27-1, Ex. B), Mr. Lopez-Ramirez testified that the vehicle held his work tools—several drills, cutters, saws, and charging stations to operate them—two other cellphones that he was going to repair, and $2,000 in cash "for the rent." Deputy Morris testified that the only items of value he found were the gun, drugs, Mr. Lopez-Ramirez's wallet, and a single cellphone. He said that he did not list those items on the report because they were either taken into evidence or handed over to the jail as Mr. Lopez-Ramirez's personal property when he was booked. Since the inventory report is meant to protect the Sheriff's Office in the event valuables go missing after a vehicle has been seized, he only listed those items that remained in the vehicle, Morris said. Although the policy provides that deputies should photograph the contents of a vehicle when possible, Morris did not do so.

## II.     Fourth Amendment Standard

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[W]hether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case . . . ." *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976) (alterations in original) (quoting *Cooper v. California*, 386 U.S. 58, 59 (1967)).

For a search or seizure to be reasonable, it must ordinarily be supported by a warrant based on probable cause. *United States v. Chavez,* 985 F.3d 1234, 1240 (10th Cir. 2021). Although the warrant requirement is subject to some limited exceptions, this only serves to underscore "the preference accorded police action taken under a warrant as against searches and seizures without one." *United States v. Ventresca*, 380 U.S. 102, 107 (1965).

When, as here, a defendant has shown that the government's conduct implicates the Fourth Amendment, "the government then bears the burden of proving that its warrantless actions were

5

justified by an exception." *Chavez*, 985 F.3d at 1240 (cleaned up) (quoting *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020). This allocation of the burden echoes the preference for searches and seizures executed pursuant to a warrant supported by probable cause. "[I]f the search or seizure was pursuant to a warrant, the defendant has the burden of proof; but if the police acted without a warrant the burden of proof is on the prosecution." 6 Wayne R. LaFave, *Search and Seizure* § 11.2(b) (6th ed., Sept. 2020 update). "[W]ithout such a rule there would be little reason for law enforcement agencies to bother with the formality of a warrant." *Id.* As for the standard of proof required, the government must carry its burden by a preponderance of the evidence. *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001).

### III. Discussion

Searches undertaken to inventory the contents of a vehicle that has been or is about to be impounded "are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine,* 479 U.S. 367, 371 (1987). The inventory exception, however, only applies if the impoundment giving rise to the search was also constitutional. *United States v. Gaines*, 918 F.3d 793, 801 (10th Cir. 2019). Here, Mr. Lopez-Ramirez challenges the constitutionality of both the impoundment and the subsequent inventory search.

### A. The Law of Community-Caretaking Impoundments

Police frequently take custody of vehicles in the interest of public safety as part of their "community caretaking function." *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976). Because the community caretaking function is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute," *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973), courts have recognized that seizures undertaken to protect public safety, rather than to further an investigation, may be reasonable even in the absence of a warrant, *see*

6

*United States v. Sanders*, 796 F.3d 1241, 1244–50 (10th Cir. 2015) (discussing the community-caretaking exception in the context of vehicle impoundments).

As the Tenth Circuit recently clarified, however, all community-caretaking impoundments must be justified by "a reasonable, non-pretextual justification." *Sanders*, 796 F.3d at 1249. It is not enough that the impoundment was authorized by some policy or statute; the impoundment must be reasonable under the Fourth Amendment. *Id.* at 1250.

In *Sanders*, police arrested the defendant on an outstanding warrant as she and a companion walked to her vehicle, which was parked on private property. *Id.* at 1243. Although the department's impoundment form contained a waiver provision, which allowed an arrestee to avoid impoundment in exchange for a release from liability and a promise to have the car removed within 24-hours, the officers did not offer her the opportunity to sign it. Instead, they impounded the vehicle "out of fear that its contents, attractive exterior, and after-market accessories would lead to a break-in, particularly because it was located in a high-crime area after dark." *Id.* After the ensuing inventory search turned up various drugs and drug paraphernalia, the defendant moved to have the evidence suppressed as the fruit of an unconstitutional inventory search. The district court granted the motion because the stated reasons for impounding the vehicle were not among those listed in the city's impound policy.

On appeal, the Tenth Circuit distinguished between two kinds of impoundments: those necessary to remove a vehicle from public property in order to protect public safety and restore traffic flow, and those that are carried out to remove a vehicle from private property in order to serve some other community-caretaking rationale. *See Sanders*, 796 F.3d at 1243–45. Analyzing the Supreme Court's foundational cases in this realm—*South Dakota v. Opperman*, 428 U.S. 364 and *Colorado v. Bertine,* 479 U.S. 367—the *Sanders* court concluded that *Opperman* and *Bertine*

established different, but not incompatible, standards regarding the constitutionality of vehicle impoundments. *Opperman*, the court explained, establishes that warrantless impoundments are constitutional when "required by the community-caretaking functions of protecting public safety and promoting the efficient movement of traffic," while *Bertine* establishes that impoundments are *unconstitutional* when they are "justified by police discretion that is either exercised as a pretext for criminal investigation or not exercised according to standardized criteria." *Sanders*, 796 F.3d at 1245. The court reasoned, however, that these rules left a wide swath of cases unaddressed, namely those in which the police impounded the vehicle pursuant to standardized criteria, but the impoundment was not justified by the public safety and traffic control goals of *Opperman*. *Id.*

After tracing its own decisions and those of other circuits, the Tenth Circuit held that impoundment of a vehicle located on private property that is neither obstructing traffic nor creating an imminent threat to public safety is constitutional only if justified by (1) a standardized policy and (2) a reasonable, non-pretextual community-caretaking rationale. *Sanders*, 796 F.3d at 1248. The court clarified that, while the first requirement applies only to private-property impoundments, the second requirement, that of a non-pretextual community-caretaking rationale, applies to all impoundments. *Id*. at 1249–50. In ascertaining whether the second requirement has been met, the court said that relevant factors include

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.

*Id.* at 1250.

Applying its holding to the vehicle in question, the court held that the impoundment was unconstitutional under either prong of its newly announced rule. *Id.* at 1250. First, because the vehicle was legally parked on private property, its impoundment had to be justified by some

8

standardized criteria. Since the police failed to follow the city's policy, which in any case did not adequately limit officer discretion, the impoundment was unconstitutional. *Id.* Second, even if the impoundment were justified by an adequate policy, the impoundment had to be justified by a reasonable, non-pretextual community caretaking rationale. Applying the reasonableness factors, the court noted that the car was legally parked on private property, that the police did not consult the owners of the parking lot about leaving the vehicle in place, that they did not offer the defendant an opportunity to make alternative arrangements, and that the defendant was willing to have someone pick up the vehicle on her behalf. Given these considerations, the court concluded that the police behaved unreasonably and lacked a non-pretextual community-caretaking justification for their seizure of the vehicle.

**B.      Application to the Present Case**

Applying *Sanders* to the facts in this case, the evidence shows that Deputy Morris's decision to tow the vehicle was unreasonable and that his stated reason for doing so—that it was necessary to remove a traffic hazard—was a pretext for his true purpose, which was to provide him with an opportunity to search the vehicle for contraband.

    **1.    Credibility**

As a preliminary matter, the Court did not find Morris to be a credible witness. He was evasive when testifying about his motives for searching the vehicle, and many of his answers were contradictory. For example, on cross-examination Morris said he had no interest in searching the vehicle beyond conducting an inventory, claiming that his primary concern was that Mr. Lopez-Ramirez had a weapon on his person. This was plainly untrue. Morris patted Lopez-Ramirez down immediately after he exited the vehicle and conducted a thorough search of his person after placing him under arrest. By the time Morris began his search, he knew with absolute certainty that Morris was unarmed. Moreover, Morris testified at length on direct-examination about how Mr. Lopez-

Ramirez appeared to be trying to hide something under his seat and how this, combined with the bullet in the floorboard, caused Morris, from early in the encounter, to "automatically assume that there's a gun in the vehicle."[1] Morris's stated reason for beginning his search under the seat was his belief that he would "locate a firearm or something of illegal nature" there. Given this testimony, Morris's subsequent claim to have had no interest in searching the vehicle other than to conduct an inventory is, frankly, risible.

If anything, the surrounding evidence shows that Morris had no interest in conducting an inventory at all. Rather than filling out the inventory sheet as he conducted the search, as one would expect if the purpose of the inventory was to catalogue its contents, Deputy Morris filled out the form hours later, long after the vehicle and its contents had already been towed. Even then, his report failed to include the defining feature of a true inventory—a list of the things found in the car when it was impounded. He also failed to take any photographs, a practice the towing policy recommended, or distribute copies of the report to the towing company and the vehicle operator, a practice the policy required.

---

1. Later, on cross-examination, after it had become clear that the defense intended to put his motives at issue, Morris denied ever having assumed that Lopez-Ramirez was hiding a gun under the seat:

> Q. Did you assume that there was a gun in the vehicle once you saw the bullet?
> A. One would assume, but I didn't -- like I said, my only concern is that he didn't have one on him and that's why I separated him from the vehicle.
> . . . .
> Q. Once you determined that it wasn't on his person did you assume it was in the vehicle?
> A. I didn't assume that there was a gun in the vehicle, I assumed there's a likelihood of a gun being in the vehicle.
> Q. Did that pique your interest as far as searching the vehicle?
> A. No.

His explanation for these shortcomings, a lack of paper forms, is unsatisfying. Nothing prevented him from using the laptop in his cruiser, which he later used to create the report, to inventory the vehicle while he still had access to its contents. Moreover, his excuse does nothing to explain why, even after the inventory sheet was complete, he never distributed the requisite copies.

It is also notable that Deputy Morris never called for backup to help control traffic or to secure Mr. Lopez-Ramirez while Morris searched the vehicle, inventoried its contents, and processed the seized evidence. If, as Morris claimed, traffic conditions were dangerous and Mr. Lopez-Ramirez could not safely be confined to the cruiser, it seems odd that Morris proceeded alone throughout the encounter. This too suggests that Morris was not entirely truthful about the circumstances surrounding the search and subsequent arrest.

Given Morris's contradictory testimony and the suspiciously slipshod manner in which he documented his search, the Court finds it probable that the vehicle did contain items of value; Deputy Morris simply failed to list them on his report. Whether that was because he never saw them, because he had no interest in the vehicle's contents beyond the contraband, or because of some other reason, the Court cannot say. This much, however, is clear: Deputy Morris did not inventory the contents of the vehicle. He searched it in order to find what Mr. Lopez-Ramirez was hiding.

To be clear, the fact that Deputy Morris wanted to search the vehicle for investigative purposes would not, standing alone, be fatal to the constitutionality of the preceding impoundment. When, under the circumstances, the vehicle, "of necessity, ha[s] to be impounded," the officer's subjective reasons for impoundment may be disregarded. *See United States v. Haro-Salcedo*, 107 F.3d 769, 771 (10th Cir. 1997). Here, however, as explained further below, the vehicle did not

have to be impounded. Moreover, Morris's obfuscation regarding his motives casts doubt on other aspects of his testimony and strongly suggests that his stated reasons for impounding the vehicle were pretextual.

### 2. Reasonableness Factors

Turning to the *Sanders* reasonableness factors, the Court finds that they weigh in favor of the defendant.

#### a. Location of the vehicle

Although the vehicle was on public property rather than private property, this factor provides little support for the government, if any. The community-caretaking rationale is at its strongest where impoundment is "immediately necessary, regardless of any other circumstances, in order to facilitate the flow of traffic or protect the public from an immediate harm." *See Sanders*, 796 F.3d at 1249. Here, the vehicle was stopped in a traffic lane, but impounding the vehicle was not "immediately necessary." The car was not disabled, and there was ample parking in the adjacent lots. Logically then, the most expedient way to restore traffic flow and eliminate any safety risk was not to leave the car in traffic and wait for a tow truck, it was to move the vehicle to one of the adjacent parking lots.

The Tenth Circuit held an impoundment to be unreasonable under similar circumstances in *United States v. Ibarra*, 955 F.2d 1405 (10th Cir. 1992). In that case, the officers said it was necessary to tow and impound the driver's vehicle because it posed a safety hazard, the driver having come to a stop along a "dangerous curve" in the highway. *Id.* 1409–10; *Ibarra*, 955 F.2d at 1411 (Baldock, J., concurring). The district court, however, found this explanation lacked credibility because (1) the officers had left the vehicle in place as they awaited a tow truck, so it did not appear to be a safety hazard, and (2), even if the vehicle needed to be moved, the defendant could have arranged that on his own through a private towing service. *Ibarra*, 955 F.2d at 1409–

12

10, 1410 n.5. Under these facts, the court agreed that, if the position of the vehicle was a true threat to public safety, the officers would have moved it to the side of the road while waiting for the tow truck to arrive. Noting that the officers may have impounded the vehicle in order to thoroughly search it for contraband, the court affirmed the district court's holding that the impoundment was unreasonable. *Id.* at 1410.

*Ibarra* is not entirely on all fours, as the government did not argue in that case, as it does here, that moving the vehicle was impracticable. This distinction is ephemeral, however, because the Court does not find credible, for several reasons, Morris's claim that he could not safely leave Mr. Lopez-Ramirez in the cruiser in order to move the vehicle.

First and foremost, Deputy Morris's testimony regarding the locking mechanism of his cruiser's doors was confusing, bordering on nonsensical. He seems to have been claiming that, even if the vehicle were secured so that the doors could not be opened from the inside, the exterior handles could not be locked, making it theoretically possible for Mr. Lopez-Ramirez to escape by rolling down the window and opening the door from the outside. Absent further clarification, this seems implausible. Given that the need to secure an arrestee or leave a vehicle momentarily unattended must arrive on a daily basis for any deputy, it seems unlikely that the Sheriff's Office would issue vehicles with doors and windows that cannot be locked.

Furthermore, even if the front doors could be opened in the manner Morris described, he could not reasonably have believed that Lopez-Ramirez was a flight risk. The parking lots were merely feet away, and Lopez-Ramirez was buckled in the front seat, hands cuffed behind his back. Lopez-Ramirez, who is not small, would have had to somehow unbuckle himself, maneuver in the confined space so as to reach the window controls, roll the window down, further maneuver so he could grasp the exterior door handle, open it, and make good his escape, all in the few seconds it

13

would have taken Morris to park the vehicle. And these obstacles would have only been compounded if Morris had moved Lopez-Ramirez to the back seat or cuffed his arms through the lap belt.

Finally, even if escape were theoretically possible, Deputy Morris had no reason to believe that Lopez-Ramirez was a flight risk at all. At the time Lopez-Ramirez was arrested, he faced only a minor traffic offense and, by Morris's own testimony, had fully cooperated throughout the stop. Indeed, given that Morris left the defendant unattended in the cruiser while searching the vehicle, the possibility that Lopez-Ramirez might flee seems not to have occurred to Morris at the time.

Under these circumstances, the fact that Deputy Morris impounded the vehicle from a public roadway is not suggestive of reasonableness. On the contrary, by leaving the car in traffic until it could be towed, Morris only prolonged any hazard it created.

### b. Other Factors

*Consent of the Private Property Owner*: Although the vehicle was not on private property at the time it was impounded, the question of owner consent remains relevant because Morris could have moved the vehicle into one of the adjacent lots rather than leaving it in traffic. Here, Morris testified that he did not consult with management for the casino or the McDonalds on this occasion, but the businesses had previously stated that they "do not want vehicles parked on their property." This certainly weighs in favor of the government, but the circumstances vitiate its salience to some degree.

If Deputy Morris had asked Lopez-Ramirez whether there was anyone nearby who could take custody of the vehicle, Morris might have discovered that Lopez-Ramirez had just dropped

some friends off at the casino.[2] Given the opportunity, Mr. Lopez-Ramirez could have arranged for his friends to take the vehicle when they left the casino later that evening. It seems unlikely that the casino would have objected to leaving a vehicle in the lot for the convenience of its own patrons.

*Alternatives to Impoundment*: This factor weighs heavily in favor of the defendant. Although the police need not always choose the least intrusive means of carrying out their community-caretaking function, it is proper to consider their failure to do so, especially when the chosen intrusion offered no additional public protection. *United States v. Neugin*, 958 F.3d 924, 934 n.8 (10th Cir. 2020) (citing *Sanders*, 796 F.3d at 1251). Rather than towing the vehicle, Deputy Morris could just as easily have moved the vehicle himself and allowed Mr. Morris to contact his friends in the casino so they could take responsibility for it. Similarly, he could have allowed Mr. Lopez-Ramirez to arrange for private towing. The fact that Morris never so much as inquired into any of these options, when viewed against his eagerness to search the vehicle for contraband, suggests that he never asked because an alternative arrangement would have robbed him of the opportunity to conduct the desired "inventory."

Moreover, although Morris claimed that the vehicle could not be left unattended in either of the private lots because that part of Catoosa "is a high crime and vandalism area," he offered no further elaboration to substantiate this claim. Further, the claim itself strains credulity, given that hundreds of vehicles are left unattended in the casino parking lot every day, many overnight.

Even if the risks were as Morris claims, this would still be a weak justification for seizing the vehicle. *See Sanders*, 796 F.3d at 1251 n.2 (recognizing that, although vandalism concerns may

---

2. When asked whether he ever asked Mr. Lopez-Ramirez whether he could contact someone to pick up the car, Morris said only "I don't recall." Given that Morris seems to have had no problem remembering any other questions, this seems unlikely.

be valid when there is no indication that a vehicle will ever be retrieved, such concerns may also serve as a source of pretext, particularly when the owner expresses willingness to accept the risks); *United States v. Duguay*, 93 F.3d 346, 352 (7th Cir. 1996) ("The suggestion that the police were obliged to impound the vehicle 'to protect it' from theft or vandalism, strikes us as making up new police obligations after the fact where none existed before. The police do not owe a duty to the general public to remove vulnerable automobiles from high-crime neighborhoods.").

*Consent of the Vehicle Operator*: The final factor weighs in favor of Mr. Lopez-Ramirez. Morris never sought Mr. Lopez-Ramirez's consent before towing the vehicle. Asked why not, Morris said, "He has no way to consent. He was arrested and there's no consent to that." This is not a valid reason. Arrest on a traffic offense does not, ipso facto, moot the issue of consent to any subsequent seizure.

In sum, the bulk of the *Sanders* factors favor the defendant. Although the vehicle was on public property and obstructing traffic, the manner in which Deputy Morris impounded the vehicle suggests that he took advantage of the circumstances in order to justify his subsequent search of the vehicle. He made no effort to determine whether there were any alternatives to towing, even though Mr. Lopez-Ramirez had friends nearby who could have taken responsibility of the vehicle, and he never asked Mr. Lopez-Ramirez if he preferred to arrange towing for himself, even though this is encouraged under the Sheriff's Office policy. Given this evidence, the Court finds that the government failed in its burden to show that the impoundment was reasonable. Moreover, given Morris's prevarication regarding his motives and the obviously investigatory nature of his search, it seems clear that his stated reasons for impounding the vehicle were merely pretextual.

## C.    Inevitable Discovery

The government argues that, even if the search was unconstitutional, the evidence should not be suppressed because it would have been discovered by a proper inventory search. Evidence

initially discovered through unlawful means need not be suppressed if it ultimately or inevitably would have been discovered by lawful means. *Nix v. Williams,* 467 U.S. 431, 444 (1984). This argument is untenable.

No inventory of the vehicle could have been conducted but for its unlawful impoundment. Thus, even if the ensuing inventory search were lawful,[3] the evidence it yielded would be barred as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963); *United States v. Ibarra,* 955 F.2d 1405, 1410 (10th Cir.1992) (declining to apply the inevitable discovery doctrine where an inventory search was preceded by an unlawful impoundment).

### IV.   Conclusion

For the reasons stated above, the Court holds that the seizure of the vehicle in this case was unreasonable and therefore in violation of the Fourth Amendment. Accordingly, the Court **grants** the defendant's Motion to Suppress (Doc. 24).

SO ORDERED this 15th day of April, 2021.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

3. Clearly the search was also unconstitutional. "An inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence, but rather an administrative procedure designed to produce an inventory." *Haro-Salcedo*, 107 F.3d at 772–73 (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990)). In order to be justified as an inventory search, the search cannot be investigatory in nature but must instead be used only as a tool to record the defendant's belongings to protect the police from potential liability. *United States v. Edwards*, 632 F.3d 633, 644 (10th Cir. 2001). Here, Morris's own testimony indicates that he searched the vehicle because he wanted to find out what Lopez-Ramirez was hiding under the seat, and the evidence clearly shows that his search was not undertaken to produce an inventory. The only "inventory" he produced was created hours after the vehicle had already been impounded; it lacked any detail about the contents of the vehicle; it failed to include items of value; and Morris never distributed copies to Mr. Lopez-Ramirez or the towing company, which was required under the policy. Because the search was aimed at finding evidence of a crime rather than producing an inventory to protect the Sheriff's Office, it was an unreasonable warrantless search under the Fourth Amendment.